DEC - 2 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA )
)
v. ) Criminal No. 1:11MJ975
)
CHRISTOPHER LARSON, )
)
Defendant. )

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Mark Embrey, being duly sworn and deposed, state as follows:

1. I am currently a Special Agent of the United States Drug Enforcement Administration ("DEA") and have been for approximately fourteen years. I have successfully completed the DEA Training Academy as well as advanced narcotics law enforcement training, which included surveillance techniques, undercover tactics, conspiracy law, probable cause for search and arrest, evidence handling, electronic surveillance methods, and arrest techniques. I am currently assigned to Tactical Diversion Group 48, Washington District Office. As a DEA Special Agent, I have worked on a number of different criminal investigations of narcotics trafficking.

2. This affidavit is being submitted in support of a criminal complaint charging CHRISTOPHER LARSON (hereinafter referred to as "LARSON") with attempt to possess with intent to distribute oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

3. The factual information supplied in this affidavit is based upon my investigation and information provided to me orally and in written form by other law enforcement officers.

Because this affidavit is being submitted for the limited purpose of obtaining a criminal complaint, I have not set forth every fact learned during the investigation.

Factual Basis Providing Probable Cause

4. In May 2011, LARSON traveled from Orlando, Florida, to the Eastern District of Virginia to meet with me and negotiate the purchase of oxycodone. I was posing as a supplier of oxycodone in an undercover capacity. During this meeting, LARSON discussed his interest in purchasing multi-kilogram quantities of oxycodone API (Active Pharmaceutical Ingredient) powder. Oxycodone API is the controlled substance that is combined with non-controlled substances to create oxycodone-based pills. LARSON and I discussed the fact that each kilogram of oxycodone API contained 1 million milligrams of oxycodone and that each kilogram could produce tens of thousands of oxycodone pills. LARSON also discussed his personal knowledge of pill production and distribution and indicated that he eventually wanted to take his drug manufacturing business offshore in order to evade U.S. law enforcement.

5. At LARSON'S request, I provided LARSON with a one-gram sample of oxycodone API during our meeting. LARSON had previously told me that he wanted a sample of oxycodone API so that he could have it tested at a laboratory for purity. LARSON explained that he had received "sham" oxycodone in the past from another source.

6. At this meeting, I told LARSON that if he purchased multiple kilograms of oxycodone API, each kilogram would cost $20,000. I told LARSON that he should send the money for the oxycodone API *via* wire transfer and that I would provide a bank account number at a later date.

7. A short time after our meeting in May 2011, I provided LARSON with bank account information so that LARSON could wire transfer the funds for the purchase of oxycodone API. During subsequent conversations and emails, LARSON indicated that he had a distribution network in place and that he was approaching various financial backers to get his drug manufacturing and distribution operation up and running.

8. In late summer 2011, LARSON asked me if I could provide a pill press machine so that he could manufacture pills domestically. LARSON had previously indicated that he had several pill press machines and alluded that these devices were located outside the United States. I emailed photographs of a pill press machine to LARSON. After seeing the photographs, LARSON expressed an interest in purchasing the pill press. I then told LARSON that he could purchase the pill press from me for $2,000. LARSON also requested that I break up a multi-kilogram shipment of oxycodone API and instead provide him with only one kilogram. I told LARSON that the price for a single kilogram would then be $22,000. LARSON agreed to paying $22,000 for one kilogram of oxycodone API.

9. On or about November 8, 2011, LARSON sent $20,000 *via* wire transfer to the undercover bank account I had previously identified. A few days later, LARSON sent an additional $4,000 to the undercover bank account. LARSON and I communicated *via* telephone and email regarding the pending transaction. During these communications, LARSON acknowledged that of the $24,000 he had wired to me, $22,000 was for the purchase of one kilogram of oxycodone API and $2,000 was for the purchase of the pill press.

10. Investigation has revealed that the originating account for both wire transfers is a JP Morgan Chase Bank account held in the name of [redacted]. Banking records reflect that

the address associated with this account is [redacted], Lakeland, Florida 33813. In addition, according to records maintained by the Florida Department of Motor Vehicles, both LARSON and [redacted] list this address as their residence of record on their Florida driver's licenses.

11. In late November 2011, LARSON agreed to travel to Northern Virginia on December 1, 2011, for purposes of acquiring the one kilogram of oxycodone API and the pill press.

12. On December 1, 2011, LARSON met with me and another undercover agent at Reagan National Airport in Arlington, Virginia, within the Eastern District of Virginia. The three of us then drove to a location in Newington, Virginia, within the Eastern District of Virginia. At that location, I provided LARSON with a pill press. LARSON examined the pill press, explained the parts of the machine, and advised of its capacity to produce mass quantities of pills. LARSON then asked that I ship the press to him at [redacted], Lakeland, Florida 33813. Shortly thereafter, we drove to a second location in Newington, Virginia. There, I handed LARSON a package and told him that it contained one kilogram of oxycodone API powder. In fact, the package contained one kilogram of heroin. LARSON was arrested as he attempted to leave the location with the kilogram of heroin in his possession.

13. Based on the aforementioned information, there is probable cause to believe that on December 1, 2011, in the Eastern District of Virginia, CHRISTOPHER LARSON did

unlawfully and knowingly attempt to possess with intent to distribute a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

FURTHER YOUR AFFIANT SAITH NOT.

Mark Embrey
Special Agent
U.S. Drug Enforcement Administration

Subscribed and sworn to me this 2nd day of December, 2011.

/s/
John F. Anderson
United States Magistrate Judge